Filed 2/28/22  In re A.R. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re A.R., et al., Persons Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU, Plaintiff and Respondent, v. L.R., Defendant and Appellant. | A162954 (Contra Costa County Super. Ct. Nos. J21-00098, J21-00099, J21-00100, J21-00101, J21-00102) |

Mother L.R. (Mother) appeals a judgment declaring her minor children dependents of the juvenile court under Welfare and Institutions Code[1] section 300, subdivision (b) and removing them from her custody.  Mother contends the jurisdictional findings and dispositional order are not supported by substantial evidence.  We affirm.

## I.  FACTUAL AND PROCEDRUAL BACKGROUND

Mother and her husband (Father) have five children, A.R., R.R., Z.R., S.R., and E.R. (ages 14, 12, nine, six, and three years old, respectively).  The family emigrated from Afghanistan in 2016.

---

[1] All statutory references are to the Welfare and Institutions Code.

Mother and Father have a history of domestic violence. In 2017, Father was arrested after he punched Mother in the head and stomach when she was two months pregnant and threatened to kill her and their unborn child. In August 2020, Father was convicted of false imprisonment and domestic violence battery. On March 2, 2021, Father was arrested for domestic violence towards Mother. Mother was " 'out of it' " and went to the hospital.

On March 11, 2021, the family came to the attention of the Contra Costa County Children & Family Services Bureau (Bureau) when the police found Mother in her car following a traffic accident. Mother was disoriented and was taken the hospital due to her "altered mental health." When the police approached her, she was talking about her children being missing. She said that the Bureau had them but she did not know where they were. She had a cell phone but could not remember the number. Mother asked that someone from the Bureau contact her with an interpreter and "let her know what is happening with the children and when her court date is going to be."

A police officer went to check on the children. He reported there was no food at the house and the 14-year-old child was "overwhelmed." The officer said the Bureau needed to pick up the children that night.

When an after-hours social worker interviewed the children at home, R.R. reported Mother left "yesterday" to get milk, and never came back. The children did not have contact with anyone until the hospital called and the police came by. R.R. said Mother has been "really sad lately, more than usual."

The next day, the assigned social worker interviewed all five children. R.R. confirmed Mother left home to get milk and was gone " 'a long time' "; when pressed, R.R. said it was "a day." R.R. said she was not really worried

even though she did not know where Mother was, and the children ate what food they could find in the home. She reported that Mother had been sick and her head hurt a lot, but denied that it had happened before. R.R. denied witnessing domestic violence, but said she heard her parents argue a lot. She denied that Mother had left them alone before, and said she felt safe at home.

A.R. told the social worker that Mother does not have a history of headaches but had been getting them frequently this month, about three times a week. He stated that Father was in jail for about a year, but he did not know where he was now. He confirmed Father hit Mother "a lot" in the past, but was unable to recall the last time. He denied that Father hit Mother two weeks before, and said they had only argued. He reported feeling safe at home.

Z.R. also denied that Mother had ever left them alone before. She confirmed that Mother had recently been in the hospital, and she did not know where either of her parents were. She denied any physical violence but said she has seen her parents fight and argue a lot. She told the social worker she felt safe at home but unsafe when her parents argue.

S.R. told the social worker that Mother's car had broken down, and that was why she did not come home. When asked where Father was, S.R. said he did not have a dad. He denied any hitting by his parents toward anyone.

The social worker also met with Mother at the hospital. Mother was kind and willing to speak with the social worker, but became increasingly distressed and disoriented as the interview proceeded. She told the social worker she was afraid to go home. When told her husband was still in jail, she said it did not matter because he had friends and family all over who could come after her anywhere she goes. She said she had no friends or family with whom she could stay. She wanted out of the hospital and

repeatedly said she just wanted to be with her children, she did not know where they were, and that they were taken from her.

Mother began to talk about being absent from the children, though they were not specifically mentioned. She said she was at home and "they" were coming after her. "They" appeared in different shapes, faces, and masks. She left home, and the police found her, took her money and keys, and left her. She no longer knew who anyone was or who she could trust. She did not know who was a police officer or who was a civilian, or who took her children. She repeated this story multiple times and it became "increasingly confusing."

Mother also told the social worker that since 2017, when her husband went to jail, "he will send people after her." She came to America from Afghanistan hoping for a safer life. She no longer knew who she was or what her name was. When the police picked her up, they gave her a different name. She was unsure where she was or if she was back in Afghanistan. She was not able to provide information about her medications.

The social worker repeatedly tried to console Mother and get reliable information from her, but Mother was unable to provide consistent statements. Due to Mother's "distressed demeanor, paranoia, and crying," the social worker told nurses on staff that she was concerned about Mother's mental health and stability.

The social worker interviewed a nurse, "John (no last name provided)," who was at the hospital when Mother was admitted the night before. Nurse John reported that when she was admitted, Mother appeared to be very confused, disoriented, and paranoid, consistent with what the social worker observed during her interview with Mother. Nurse John expressed concern that Mother had no family or friends to help her. Nurse John confirmed

4

Mother had been cleared to be released and there was no call for a "psych evaluation."

The social worker interviewed Father at the Martinez Detention Facility. Father denied hitting Mother, but confirmed they argue. He repeatedly stated he was innocent and his wife had mental health issues. He told the social worker that Mother was bipolar and had postpartum depression. He did not know what medications she was on, but implied she did not reliably take them. He said that two years ago, Mother had been hospitalized for three months but he took her home against medical advice so she could be with her children. Father said Mother regularly threatens him and "make[s] lies" about him, including hurting herself and blaming him.

On March 16, 2021, the Bureau filed section 300, subdivision (b)(1) petitions as to each of the five children alleging a substantial risk the children would suffer serious physical harm or illness because (1) Mother left the children unattended at home with no food or milk, (2) Mother was found in her car and admitted to the hospital due to mental health concerns, and (3) Mother's history of domestic violence with Father. On March 18, the juvenile court detained the children, placed them in foster care, and ordered reunification services for the parents.

At the initial jurisdiction hearing on April 20, 2021, Mother's counsel requested appointment of a guardian ad litem for Mother. Counsel stated that since the detention hearing, Mother had been placed on temporary involuntary holds under section 5150 two additional times. Counsel was not confident Mother understood the nature of the proceedings or why her children were being detained. The social worker told the juvenile court that after the last hearing, Mother was taken by family members out of state hoping "to be hooked up with a provider for some support." The relatives said

5

after Mother's first visit with the children, she was in a state of "mania," dancing around, taking off her clothes, and taking several showers. She was taken to the hospital and put on an involuntary hold. A few hours after she was discharged from that hold, she went to a hospital and was placed on another involuntary hold where she was kept for "quite some time." The social worker also told the court Mother had been in contact with the children, telling them about the case and saying that family members have hit her.

After finding exceptional circumstances to set the disposition hearing more than 60 days after detention, the juvenile court set the jurisdiction and disposition hearing for June 1, 2021. On April 23, the juvenile court appointed a guardian ad litem for Mother.

The report prepared in May by the social worker for the June disposition hearing contained additional information about events occurring after the detention hearing. The report confirmed that Mother left the state after the March 18 detention hearing and began residing with family members, including Mother's older sister. Mother's sister felt Mother might have been drugged by Father, and planned to take her to the doctor for an evaluation. Following the first visit with her children, Mother was taken to the hospital because she began taking her clothes off, dancing around the house, and showering "constantly." She was taken to the hospital, held involuntarily, and discharged on April 2, 2021.

Four days later, the social worker received voice mail messages from a social worker at another hospital, relaying that Mother was hospitalized again for mania. Mother's attorney told the social worker on April 8, that Mother may have to be conserved due to her mental illness. The social

worker was also later informed that Mother may be labeled " 'gravely disabled' " and committed.

On April 16, the social worker received a call from Mother. When she called Mother back, Mother's attorney was with Mother on the phone. Mother told the social worker that she had returned to California and said she would like to see her children and did not understand why they are not in her care. She said her family members hit her, and that she would like to have the children returned to her care as soon as possible.

A few days later, the social worker spoke with Mother's sister again. Mother's sister shared that they had booked a flight home for Mother because " 'she drive us crazy.' " The sister shared that Mother had been making up allegations against the family members, which caused the sister to think Mother was making up the allegations that Father hit her.

On April 22, the social worker met with Mother at the Bureau office. Mother told the social worker she had been trying to separate from Father for "some time now," and that he was " 'cruel to her on March 13." Mother told the social worker she does not have depression or anxiety, and that she takes vitamins for her anemia but no other medications. Mother told the social worker that her sister and her cousin took her to Seattle, "made 'a story,' " and attempted to portray her as unwell. Mother said her sister hit her, and " 'they try to pretend I'm a psycho.' "

When the social worker explained to Mother that her children had been removed due to concerns about the children being left alone, the domestic violence in the home, and Mother's mental health issues, Mother responded by saying there were " 'violations' " in the home, but denied fighting with Father in the presence of the children. She said he was " 'disrespecting' " her, " 'cursing' " and " 'threatening' " her. She said she wanted a divorce, and did

not want Father around her children.  Mother also told the social worker that Father's brother may be trying to harm her and was a " 'very dangerous' " person, and that one of Father's friends had tried to rape her.

In the social worker's disposition interview with Mother, Mother described a long history of domestic violence with Father.  Mother said one time when she was pregnant with E.R., Father hit her, resulting in a blood clot in her lung.  Mother told the social worker that the first six months of her marriage to Father were " 'good, but after that, the trouble started.' "  Mother said shortly after A.R.'s birth in Afghanistan, the domestic violence began. Father, his mother, and his brothers all " 'beat' " her if she did not complete simple tasks, and separated her from her children if she tried to take any action against them.  Mother said even after she moved to the United States with Father in 2016, things did not change.  " 'He was beating me whenever I was during my pregnancy, he hit me.  He hit my head against a wall.  He never been change.' "  Mother also said Father hit the children.  Mother said, " 'even when we came to the US in 2016, when he hit me really badly, he went to the jail, but after the jail, after he came back he . . . in 2017, when he got in jail because of his domestic violence, his brother, . . . he came from Texas and threatened me and my family and asked why he involved the police.' "  She said A.R. had called the police, and the family blamed A.R. for Father being in jail.

Mother said she would like to divorce Father and separate from him entirely.  " 'I don't want to suffer my kids.  They suffered a lot.  I don't want them to suffer anymore,' " Mother said.  She told the social worker the children witnessed the domestic violence in the home.  Mother also told the social worker that in 2019, Father hit S.R. when he was four years old.  When Mother asked him why he was hitting the kids, he turned and stabbed her

8

with a knife, requiring her to get 16 stitches. Mother said Father " 'tried to put [her] in the bathroom,' " but she managed to get away.

On June 1, 2021, the juvenile court held a contested jurisdiction and disposition hearing. Mother appeared at the hearing via Zoom with the assistance of a Dari language interpreter, her counsel, and her guardian ad litem. Mother denied the allegations of the petition and objected to jurisdiction, but presented no additional evidence. Mother asserted there were no mental health concerns and that she was only hospitalized as a result of the car accident, not her mental health. The juvenile court sustained the allegations in each of the five petitions based on the evidence presented in the detention and jurisdiction report.

As to disposition, Mother objected to the recommendation of family reunification services, asserting she is able to have the children in her care, does not have any mental health issues, and misses her children dearly. Mother argued Father was out of the home, she had no intention of getting back together with him, and there was no longer a danger of domestic violence as a result.

The juvenile court ruled: "Based on the evidence that has been submitted to me in both the detention and jurisdiction report and the disposition report, I believe there is very strong evidence that [Mother] does suffer from mental health issues that are longstanding and very significant. She has been repeatedly committed to the hospital and held for treatment and observation. [¶] There has also been a long history of domestic violence between the parents. So I am going to follow the recommendations in today's disposition report." The court found all five children dependents of the court, removed the children, and ordered family reunification services.

Mother timely appealed.

9

## II. DISCUSSION

### A. *Jurisdictional Findings*

Mother contends the juvenile court's jurisdictional findings are not supported by substantial evidence. She repeatedly argues insufficient evidence supports the findings because "the social worker produced no medical records, no police records, and no primary source evidence" to support the allegations of the petitions regarding Mother.

Section 300, subdivision (b)(1) authorizes dependency jurisdiction where "there is a substantial risk that the child will suffer[ ] serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child." We review a trial court's jurisdictional findings for substantial evidence. (*In re T.V.* (2013) 217 Cal.App.4th 126, 132–133; *In re David M.* (2005) 134 Cal.App.4th 822, 828, disapproved on another ground in *In re R.T.* (2017) 3 Cal.5th 622, 628.) We view the evidence in the light most favorable to the prevailing party, resolving all conflicts in support of the trial court's findings. (*In re T.V.*, at p. 133; *In re David M.*, at p. 828.)

Ample evidence in the record supports the juvenile court's jurisdictional findings here. First, there was substantial evidence that Mother suffered from mental health issues that put her children at risk. When the police found Mother in her car, she was disoriented and talking about her children being missing. Mother was taken to the hospital because of her "altered mental health." At the hospital, Mother was very confused, disoriented, and paranoid. She did not know where she was or if she was back in Afghanistan, did not know where her children were, did not know what her name was, and thought people were coming after her. The social worker reported that based on Mother's inability to provide reliable information and her distressed

10

demeanor, paranoia, and crying, the social worker told hospital staff she had concerns for Mother's mental health even though she had been cleared for discharge. The hospital nurse at the hospital when Mother was admitted also reported Mother was "very confused, disoriented, and paranoid," consistent with what the social worker observed. R.R. reported that Mother had been "really sad lately, more than usual." Father reported Mother had mental health issues, had been previously hospitalized, did not reliably take her medication, and had previously been on a section 5250 hold for two or three months.

In addition to the evidence about Mother's mental health issues, the detention and jurisdiction report also described a lengthy history of domestic violence between Mother and Father. In 2017, Father was arrested after he punched Mother in the head and stomach when she was two months pregnant, and threatened to kill her and their unborn child. In 2020, Father was convicted of false imprisonment and domestic violence battery. Most recently, on March 2, 2021, Father was again arrested for domestic violence against Mother. Mother was " 'out of it' " and went to the hospital. A.R. told the social worker that his dad hit his mom "a lot" in the past, and Z.R. told the social worker she had seen her parents "fight and argue a lot" and that she feels unsafe when her parents argue.

Mother's principal argument, repeated multiple times throughout her opening brief, is that the evidence was insufficient because the social worker failed to provide any "primary source evidence" supporting jurisdiction, such as health records or police reports in support of the statements in the detention and jurisdiction report. Mother cites no legal authority in support of her argument that such evidence is required, however, and the law is to the contrary.

11

Section 355, subdivision (b) provides that the Bureau's report and the hearsay statements contained therein "constitute[] competent evidence upon which a finding of jurisdiction pursuant to Section 300 may be based . . . ." (Accord, *In re Malinda S.* (1990) 51 Cal.3d 368, 375–382; *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1652.) Pursuant to section 355, if a parent *timely objects* to admission of specific hearsay evidence contained in the report, the "evidence shall not be sufficient *by itself* to support a jurisdictional finding or any ultimate fact upon which a jurisdictional finding is based," *unless* the Bureau establishes that the statements fall into one of four enumerated categories set forth in subdivision (c)(1)(A) through (D). (§ 355, subd. (c)(1), italics added.) Those categories include: (A) the hearsay would be admissible in any civil or criminal proceeding under any statutory or decisional exception to the prohibition against hearsay; (B) the hearsay declarant is a minor under 12 years of age who is the subject of the jurisdictional hearing; (C) the hearsay declarant is of a certain occupation, including a peace officer, healthcare worker, or a social worker; and (D) the declarant is available for cross-examination. (§ 355, subd. (c)(1).)

Mother's counsel made no objection to the hearsay in the report either before or at the jurisdictional hearing. When asked at the hearing whether the parties stipulated to a  factual basis for jurisdiction, Mother's counsel told the court only: "Your honor, we are not stipulating or participating in any type of agreement with the Department. My client is objecting. And because we are in a trial posture, it was my intention today to object on her behalf as she denies the allegations. She states . . . there are no mental health concerns regarding her and that she was only hospitalized due to being in a car accident, not due to her mental health. [¶] So she is not in agreement with the Department's allegations. She is not submitting to the

12

Department's allegations. She is objecting, but we have no evidence to present at this time." It is clear from the context of these remarks that Mother denied and objected to the Bureau's *allegations*, but there is no statement suggesting Mother objected to any hearsay in the jurisdictional report. Absent a timely and specific objection to the hearsay statements, the statements were competent evidence upon which the jurisdictional findings could be based. (§ 355, subd. (c)(1) & (2) [party must raise timely objection to the admission of specific hearsay evidence in the social study; objection must identify "with reasonable specificity the disputed hearsay evidence" and give petitioner a reasonable period of time to meet the objection before contested hearing].) Moreover, Mother forfeited her contentions regarding the juvenile court's reliance on hearsay in evaluating the totality of the circumstances to support the jurisdictional findings by failing to object in the juvenile court. (See *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1338–1339.)

Mother also emphasizes that Father was the perpetrator of domestic violence and contends there was no evidence of a substantial risk to the children, many of whom denied even witnessing Father hit Mother. It is well established, however, that "[e]xposure to domestic violence may serve as the basis of a jurisdictional finding under section 300, subdivision (b)." (*In re R.C.* (2012) 210 Cal.App.4th 930, 941.) "The court need not wait until the child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child," and the court "may consider past events in deciding whether a child presently needs the court's protection." (*In re N.M.* (2011) 197 Cal.App.4th 159, 165.) At the time of the jurisdiction hearing, the evidence showed a lengthy history of domestic violence dating back at least four years, with the most recent incident occurring nine days before the children were detained. Moreover, A.R. told the social worker Father hit

13

Mother "a lot" in the past. R.R. reported that she had heard her parents argue a lot, and Z.R. reported that she feels "unsafe" when her parents argue.

Mother contends this case is like *In re M.W.* (2015) 238 Cal.App.4th 1444 and *In re Daisy H.* (2011) 192 Cal.App.4th 713, where insufficient evidence supported allegations concerning domestic violence. But both cases are distinguishable. In *In re M.W.*, the record contained evidence of a single incident of domestic violence seven years before the hearing. (*In re M.W.*, at p. 1454.) There was no evidence the parents had engaged in altercations since that time, nor any evidence that they lived together, or that the children had seen their father in years. (*Ibid.*) In *Daisy H.*, a single incident of domestic violence occurring at least two, and possibly seven, years prior to the juvenile dependency proceedings was insufficient to establish jurisdiction where the parents had since separated and there was no indication the children were exposed to violence. (*In re Daisy H.*, at p. 717.) Here, by contrast, Father was arrested for domestic violence nine days before the children were detained, and was incarcerated based on violating a restraining order, parole violation, and threat to terrorize. Moreover, the previous summer Father had been convicted of false imprisonment and battery. As counsel points out in Mother's opening brief, Mother was previously beaten so severely by Father that she sustained factures to her face, the children corroborated that Father hit Mother, and even Father admitted slapping Mother. Although Mother stated she wanted to get a divorce, she was still married to Father at the time of the hearing. And while Father was presently incarcerated, the record does not indicate when he would be released. The record also reflects that Father previously engaged in incidents of domestic violence after returning home from jail.

14

Mother argues she was "stable," did not take medication, and spoke eloquently at the guardian ad litem hearing. She contends because English is not her first language, she needed help from a guardian ad litem because of the language barrier rather than because she had mental health issues. She also points to evidence the children denied witnessing domestic violence, and argues that she was gone little more than a day, left her children with their older siblings, and that the children were unconcerned about being left alone. But in reviewing the sufficiency of the evidence on appeal, we do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence, or reweigh the evidence before the juvenile court. Instead, we draw all reasonable inferences in support of the findings and affirm, even if other evidence supports a contrary finding. (*In re T.V.*, *supra*, 217 Cal.App.4th at p. 133.)

Here, as we have discussed, substantial evidence supports the juvenile court's conclusion that the children remained at risk.[2]

## B. *Removal Order*

Mother also contends there was insufficient evidence to support the disposition order removing the children from her custody.

At a disposition hearing removing a child from their parents, the court's findings must be made on clear and convincing evidence. (§ 361, subd. (c).) A child may be removed from parental custody if there is a substantial danger to the child's physical health, safety, protection, or physical or

---

[2] Mother asserts a cursory argument that, "If the jurisdictional allegations are reversed as to Mother, the orders for reunification services should also be reversed." Because we have determined substantial evidence supports the jurisdictional findings under section 300, subdivision (b) on the grounds of mental health and domestic violence, we reject Mother's arguments that the juvenile court erred in ordering reunification services.

emotional well-being if the child were returned home and there are no reasonable means to protect the child without removal. (*Id.*, subd. (c)(1).) "The high standard of proof by which this finding must be made is an essential aspect of the presumptive, constitutional right of parents to care for their children." (*In re Henry V.* (2004) 119 Cal.App.4th 522, 525.) However, "[t]he parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re T.V.*, *supra*, 217 Cal.App.4th at pp. 135–136.) We review the trial court's order for substantial evidence " ' "to determine the existence of the clear and convincing standard of proof." ' " (*In re Henry V.*, at p. 529; see *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996 [appellate review of finding under clear and convincing standard requires appellate court to determine "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true"]; *In re V.L.* (2020) 54 Cal.App.5th 147, 154–155 [standard of review described in *O.B.* applies to removal findings under § 361, subd. (c)].)

Here, there was more than sufficient evidence to support the juvenile court's finding that there was a substantial danger, or risk of harm, to the children if returned to Mother's care. The evidence we discussed above supporting the jurisdictional findings also supports the findings that the children were subject to removal due to an ongoing risk of harm.

In addition, the disposition report provided substantial additional evidence of Mother's long-standing and current mental health issues.[3] The report revealed that Mother was twice hospitalized for mental health

---

[3] As with the jurisdictional report, mother did not object to the disposition report or any specific hearsay statements therein.

concerns after the detention hearing, and that she was removing her clothing, dancing around, and showering constantly at her sister's house shortly before she was hospitalized for mania. The social worker was informed that Mother may be labeled "gravely disabled" and committed. Moreover, the lengthy history of domestic violence between the parents was supported by police reports summarized in the social study, Father's criminal history, and Mother's own disposition interview with the social worker in which she described incidents of domestic violence by Father which began shortly after her first child's birth and continued even after they relocated to the United States. Mother admitted to the social worker that the children witnessed the domestic violence and that Father hit the children. At the same time, Mother refused to participate in reunification services because she did not believe she had any issues, and did not understand why her children could not be in her care. Because substantial evidence supported the juvenile court's finding of a risk of harm by clear and convincing evidence, the juvenile court did not abuse its discretion in ordering the children removed from Mother's custody.

## III. DISPOSITION

The judgment is affirmed.

MARGULIES, J.

WE CONCUR:

HUMES, P. J.

BANKE, J.

A162954
*In re A.R.*